# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## PADUCAH DIVISION
## CIVIL ACTION NO. 5:12-CV-00084-TBR

FANNIE MAE CHAMP, *et al.*                                    Plaintiffs

v.

MARQUETTE TRANSPORTATION COMPANY., LLC                 Defendant

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon the following Motions filed by Defendant Marquette Transportation Company, LLC:

(1) Motion in Limine to Exclude Certain Opinions of Plaintiffs' Expert, Dr. Joseph Varon, (Docket No. 49);

(2) Motion in Limine to Exclude Plaintiffs' Expert, Edward Gras, (Docket No. 48);

(3) Motion for Judgment on the Pleadings of Certain Claims, (Docket No. 39);

(4) Motion in Limine to Exclude Evidence of Fannie Mae Champ's Alleged Damages, (Docket No. 40);

(5) Motion for Partial Summary Judgment as to Certain Categories of Damages, (Docket No. 42);

(6) Motion for Judgment on the Pleadings or, Alternatively, for Partial Summary Judgment Relative to Particular Negligence Claims, (Docket No. 43); and

(7) Motion for Partial Summary Judgment as to Paragraph 11(j) of Plaintiffs' Amended Complaint, (Docket No. 47).

Plaintiffs have responded to each of these Motions, (Docket Nos. 62; 61; 52; 53; 51; 50; and 60, respectively), and Defendant has replied, (Docket Nos. 67; 68; 57; 56; 58; 59; and 66, respectively). As such, these matters now are ripe for adjudication.

# BACKGROUND

At all times pertinent to this litigation, Plaintiffs' decedent, Sanches Champ (Champ), was the First Mate on board the M/V RANDY ECKSTEIN, an 8,400 horsepower inland-river towboat owned by the Defendant, Marquette Transportation Company, LLC (Marquette). The RANDY ECKSTEIN ordinarily operated on the Lower Mississippi River (LMR) from Cairo, Illinois, to the vicinity of New Orleans, Louisiana. On October 25, 2011, the RANDY ECKSTEIN was southbound on the LMR with a tow comprised of 23 loaded hopper barges. On the evening of October 25, the RANDY ECKSTEIN and her tow were under the command of Captain Danny Boston proceeding downriver at a normal rate of speed. Captain Boston holds a United States Coast Guard (USCG) license that allows him to operate inland-river towing vessels, and has worked under that license for Marquette for some fourteen years.

At approximately 10:15 p.m. on October 25, the RANDY ECKSTEIN was near Mile 132 on the LMR just below Laplace, Louisiana, when Champ approached Captain Boston in the wheelhouse where Captain Boston was on watch and in operational control of the vessel and her tow. Champ reported to Captain Boston that his asthma medication was not working and that he needed to get off the vessel and go to the emergency room to receive a steroid shot. Champ related to Captain Boston that once he received a shot he would be fine and could immediately return to work. Captain Boston observed Champ and spoke with him about his condition before contacting a crew dispatcher at Marquette and requesting that transportation be provided for Champ to go to the hospital from St. Rose Fleet, a short distance downriver. According to Captain Boston, Champ did not disagree with this plan.

Captain Boston testified that when he asked Champ if they needed to stop immediately, Champ replied "No, I'll be fine." (Docket No. 43-12, at 8.) Captain Boston and the Relief Mate, Terry Fulton, further testified that Champ did not appear to be out of breath or laboring in his breathing while he was in the wheelhouse.

Champ remained in the wheelhouse for approximately twenty minutes after first reporting his condition to Captain Boston. During that time, Champ completed the paperwork required to depart the vessel for medical care and spoke socially with Captain Boston's wife via phone. After he took a required predeparture drug test, Champ went downstairs to his room until the vessel arrived at the fleet.

Sometime after returning to his room, Champ's condition worsened. Champ did not call for help or alert the crew. Champ was found by Relief Mate Fulton, who called Captain Boston to Champ's room. At that point, Champ was having difficulty breathing and talking. When Captain Boston observed Champ's change in condition, he called to another crew member and instructed him to call 911 and get an ambulance to meet the vessel at the fleet location at Mile 126, which was roughly one mile away.

Captain Boston remained with Champ in his room, and a few moments later Champ passed out. Champ was moved by way of a Stokes basket into the galley. Shortly thereafter, the crew reported to Captain Boston that Champ had stopped breathing. Captain Boston performed mouth-to-mouth resuscitation on Champ, and Champ began breathing again. When Champ stopped breathing again, Captain Boston performed mouth to mouth for a second time, and Champ again resumed breathing.

Shortly thereafter, ambulance personnel arrived, having been transported to the RANDY ECKSTEIN by one of the fleet tugs from Upper St. Rose Fleet. Champ was transported to the dock and taken by ambulance to a local hospital. In the early hours of October 26, Champ died as a result of a sudden onset fatal asthma event.

This lawsuit was filed on June 22, 2012, by Champ's mother, Fannie Mae Champ (Mrs. Champ), individually, and as the representative of the Champ's estate, as well as by Champ's daughter, Sanquesha Sias (Sias), and by Stacye Strauder, as next friend of L.S. (L.S.), Champ's minor daughter. (Docket No. 1.) Plaintiffs filed their First Amended Complaint on October 23, 2012, (Docket No. 27). Plaintiffs allege that Champ was a Jones Act seaman and bring claims of negligence under the Jones Act. Specifically, Plaintiffs allege that Marquette was negligent for:

(a)   Failing to properly supervise its crew;
(b)   Failing to properly train its employees;
(c)   Failing to provide a safe workplace environment;
(d)   Failing to warn of dangerous conditions on board the vessel;
(e)   Failing to provide proper safety and medical equipment;
(f)   Operating the vessel with an inadequate crew;
(g)   Failing to provide adequate and immediate medical attention;
(h)   Violating applicable Coast Guard regulations, OSHA regulations, and/or other regulations;
(i)   Failing to adequately evaluate [Champ]'s medical condition to determine whether he could safely perform his job;
(j)   Allowing [Champ] to continue working aboard [Marquette]'s vessel when [Champ]'s medical condition placed him at risk of serious injury or death; and
(k)   Other acts deemed negligent.

(Docket No. 27, at 3, ¶ 11.) Plaintiffs also allege that the RANDY ECKSTEIN was unseaworthy. (Docket No. 27, at 3, ¶ 12.)

DISCUSSION

Marquette now moves to limit or exclude the expert opinions of Plaintiffs' experts, as well as for judgment on the pleadings and/or partial summary judgment on a number of Plaintiffs' claims. Because these several Motions are necessarily related, the Court will address them collectively in this Opinion.

## I. Motions in Limine to Exclude Plaintiffs' Experts

Marquette separately moves to exclude the expert opinions of Plaintiffs' maritime expert and to exclude or limit the opinions and testimony of Plaintiffs' medical expert. The Court will address each of these Motions in turn.

### A. Standard for the Admissibility of Expert Testimony

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>   (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>   (b) the testimony is based on sufficient facts or data;
>   (c) the testimony is the product of reliable principles and methods; and
>   (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, "the Supreme Court established a general gatekeeping obligation for trial courts to exclude from trial expert testimony that is unreliable and irrelevant." *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (alteration and internal quotation marks omitted) (quoting *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001)) (applying *Daubert*, 509 U.S.

579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999)). In performing its gatekeeping function, the Court must determine whether evidence proffered under Rule 702 "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. A key consideration is "whether the reasoning or methodology underlying the testimony is sufficiently valid." *Id.* at 592-93. The Supreme Court advises that the inquiry is "a flexible one," and that "[t]he focus . . . must be solely on principles and methodology, not on the conclusions they generate." *Id.* at 594-95. A testifying expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. But *Daubert* did not impose any new standard, other than that already found in the Federal Rules of Evidence, for the admissibility of the testimony of nonscientific expert witnesses. *See id.*

Despite that there is no "definitive checklist or test" for meeting the standard of Rule 702, *Daubert* laid out a number of factors that typically "bear on the inquiry," including: whether the theory or method in question "can be (and has been) tested," whether it "has been subjected to peer review and publication," whether it has a "known or potential rate of error," and whether the theory or technique enjoys "general acceptance" in the "relevant scientific community." *Daubert*, 509 U.S. at 593-94. Although *Daubert* addressed scientific evidence, the Supreme Court in *Kumho Tire Co. v. Carmichael* held that a trial court may consider the *Daubert* factors for all types of expert evidence. *Kumho Tire*, 526 U.S. at 150. Thus, the *Daubert* factors are nonexhaustive and may not be pertinent in cases where "the relevant reliability concerns

. . . focus upon personal knowledge or experience."[1] *Id.*; *see also First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001).

The Sixth Circuit has developed further guidance on Rule 702 by recently outlining a number of "[r]ed flags that caution against certifying an expert." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (citing *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009)). These include "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Id.* (citing *Best*, 563 F.3d at 177). Also, that a purported expert's testimony was prepared solely for litigation may also be grounds for exclusion. *Id.* (citing *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007)).

Where the testimony of a proffered expert is challenged for insufficient "factual basis, data, principles, methods, or their application . . . the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of [his or

_____

[1] The Advisory Committee Notes to Rule 702 reinforce this position:

> Some types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than others. Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise. The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded. *See, e.g.*, American College of Trial Lawyers, Standards and Procedures for Determining the Admissibility of Expert Testimony after *Daubert*, 157 F.R.D. 571, 579 (1994) ("[W]hether the testimony concerns economic principles, accounting standards, property valuation, or other non-scientific subjects, it should be evaluated by reference to the 'knowledge and experience' of that particular field.").

Fed. R. Evid. 702 advisory committee's note (2000 amend.).

her] discipline." *Kumho Tire*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592).  The Court need not necessarily hold a *Daubert* hearing to determine the admissibility of expert testimony but, nonetheless, must ensure that the disputed testimony is both relevant and reliable.  *See Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000).  Generally, "a trial judge . . . ha[s] considerable leeway in deciding whether particular expert testimony is reliable," *Kumho Tire*, 526 U.S. at 152; *accord Conwood*, 290 F.3d at 792; *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000), and his decision whether to admit expert testimony is reviewed for abuse of discretion, *see Kumho Tire*, 526 U.S. at 142; *Newell Rubbermaid*, 676 F.3d at 527; *Hardyman*, 243 F.3d at 258; *see also Tamraz v. Lincoln Electric Co.*, 620 F.3d 665, 672 (6th Cir. 2010) ("Rule 702, we recognize, does not require anything approaching absolute certainty.  And where one person sees speculation, we acknowledge, another may see knowledge, which is why the district court enjoys broad discretion over where to draw the line." (internal citations omitted)).

### B.    Plaintiffs' Expert Dr. Joseph Varon

Marquette moves to exclude several opinions or categories of opinions offered by Dr. Joseph Varon, Plaintiffs' medical expert.  (Docket No. 62.)

### 1.    Opinions concerning the proper medical evaluation and examination of Champ

Marquette first moves to exclude Dr. Varon's opinions that Champ "should be evaluated by a healthcare provider at regular intervals while working on a marine vessel with limited access to health care," and that Champ "should have had a higher level of screening such as an evaluation by a pulmonologist prior to being released by [Marquette] to work on the marine vessel."  (*See* Docket Nos. 49-1, at 8-11; 49-6, at 3.)

There seems to be no dispute regarding Dr. Varon's qualifications as a medical expert. Instead, Marquette argues that these opinions exceed the permissible scope of expert testimony by imposing a medical standard of care on Marquette that, in effect, would require Marquette to substitute its own unqualified medical judgment for that of Champ's physicians. (Docket No. 49-1, at 8-11.)

The evidence of record shows that Champ underwent and passed two preemployment physicals relative to his employment with Marquette, the first of which in April 2006 and the second in July 2010. (Docket Nos. 49-8; 49-9.) Both times, Champ was deemed medically fit for work as a deckhand. The evidence of record also shows that Champ suffered several asthma-related episodes during his employment with Marquette. First, in October 2006, Champ became short of breath and was taken to Parkway Regional Hospital where he was treated and discharged with instructions to follow up with his own doctor as needed. (Docket No. 49-10.) Second, in October 2010, while working on the RANDY ECKSTEIN, Champ experienced an asthma attack and was taken to Western Baptist Hospital in Paducah, Kentucky. (Docket No. 49-11.) Champ was treated with several prescriptions and released to return to work in one week with the restriction that he "avoid smoke, dust." (Docket No. 49-11, at 3.) Champ was not referred to a specialist or instructed to follow up. (Docket No. 49-11, at 3.) Third, on January 9, 2011, again while working on the RANDY ECKSTEIN, Champ experienced another asthma attack and was disembarked and taken to East Jefferson Hospital in Metairie, Louisiana, the following day. (Docket No. 49-12.) Champ was treated and released with instructions that he not work that day or the next, that he stop smoking, and that he return if his condition worsened. (Docket No. 49-12,

at 4.) Though the record is not entirely clear, it appears that Champ was seen by his regular physician, Dr. J.R. Todd, a few days thereafter and again cleared to return to work with no restrictions. (Docket No. 49-13.)

In regard to the proper medical evaluation and examination of Champ, Dr. Varon offers the following specific opinions:

> 1. A patient with several prior episodes of cough, shortness of breath, and difficulty breathing requiring multiple [emergency room] visits, such as [Champ] should be evaluated by a healthcare provider at regular intervals while working on a marine vessel with limited access to health care.
>
> 2. Additionally, and especially after similar incidents in the past, Mr. Champ should have had a higher level of screening such as an evaluation by a pulmonologist prior to being released by the company to work on the marine vessel.

(Docket No. 49-6, at 3.) Marquette argues that these opinions impose a medical standard of care on Marquette, insofar as Dr. Varon is opining "that Marquette had a duty to go beyond the recommendations of the doctors who treated Mr. Champ to require additional treatment and care of a pulmonologist, even though none was recommended." (Docket No. 49-1, at 8.) Plaintiffs respond, arguing that "Dr. Varon is simply providing his expert medical opinion as to the seriousness of Mr. Champ's condition and the medical treatment that would have been suitable given his condition." (Docket No. 62-1, at 5.) Plaintiffs urge that Dr. Varon is merely opining that, given Marquette's knowledge of Champ's medical history, it should have taken further steps in determining his fitness of duty aboard the RANDY ECKSTEIN. (*See* Docket No. 62-1, at 7.)

The Court agrees with Marquette that Dr. Varon's opinions in this regard are not the proper subject of expert testimony on this case. The record reflects that Champ was treated on several occasions for problems with his asthma and that each time he was released to return to work almost immediately. No treating physician ever referred Champ to a pulmonary specialist or ordered regular follow-up care for his asthma. No treating physician, despite being aware of Champ's occupation, ever recommended that he not work, or restricted him from working, on a river vessel. In his deposition, Dr. Varon acknowledged that there is nothing to indicate that Marquette was ever informed by any physician that Champ required additional treatment or should be restricted from working aboard a river vessel. Moreover, the record shows that Marquette required Champ to undergo two preemployment physicals, the most recent in July 2010, which Champ passed.

Dr. Varon's opinions, in essence, amount to his criticism of Champ's treating physicians. Dr. Varon certainly appears qualified to opine as to the proper course of treatment for Champ and whether Champ's doctors should have recommended that he been seen by a specialist or that he receive further or continuing evaluation. But this is not a medical malpractice case, and Plaintiffs have not alleged that any of Champ's treating or evaluating physicians acted negligently; thus, whether those physicians provided appropriate medical treatment and recommendations is not at issue. As such, Dr. Varon's opinions are not relevant to the actions of Marquette as Champ's employer. In effect, Dr. Varon's opinions would have Marquette reject or second guess the opinions of each of the doctors that treated or evaluated Champ and, instead, substitute its own unqualified medical judgment as to the type and degree of medical evaluation

Champ needed. While Champ's physicians may have had a duty to order that he "be evaluated . . . at regular intervals while working on a marine vessel with limited access to health care" or that he receive "a higher level of screening such as an evaluation by a pulmonologist prior to being released . . . to work on the marine vessel," (*see* Docket No. 49-6, at 3), there is no such duty on the part of Marquette, as Champ's employer.[2]

Dr. Varon's opinions in this regard, however correct and well-founded they may be, amount to imposing a duty of care on Marquette, as an employer, that does not exist in the law. As such, these opinions are not relevant to Plaintiffs' action against Marquette and not the proper subject of expert testimony in this case. For these reasons, the Court will grant this portion of Marquette's Motion.

> **2. Opinions concerning whether Champ could have been removed sooner or whether removing him from the vessel before Upper St. Rose Fleet would have resulted in earlier access to medical care**

Marquette next moves to exclude Dr. Varon's opinions whether it would have been feasible to remove Champ from the vessel sooner. Marquette's characterization of Dr. Varon's proposed opinions in this regard is somewhat misleading, given Dr. Varon's opinions appear less focused on the capability of evacuating Champ than on the medical need that he be evacuated as quickly as possible. That is, Dr. Varon does not appear to offer an opinion as to whether Champ *could* have been removed from the vessel sooner; he in fact concedes that he is not a maritime expert and has no familiarity with the LMR, the facilities near the RANDY ECKSTEIN's location, or the difficulties attendant to obtaining medical care for a person aboard a river vessel. Instead, he

---

[2] Whether Marquette owed Champ a duty to adequately evaluate his medical condition is discussed in further detail *infra* Part II.D.2.

appears to simply opine that, based on his medical expertise, the outcome would likely have been different had Champ received medical treatment sooner than he did:

> 5.   In my review of the records and depositions, I noted that the captain was aware of the symptoms and prior history of asthma, as well as the prior need to take this gentleman to shore due to exacerbations.   Yet, I see no efforts made by the captain to immediately take [Champ] to shore.   On the contrary, a significant delay occurred and the boat continued its course.   *Had Mr. Champ been transported to shore at an earlier time, as soon as he complained of his symptoms, more likely than note* [sic] *he would be alive today.   Assisting the respiratory function of Mr. Champ would have made the difference between his life and death.*

(Docket No. 49-6, at 4 (emphasis added).)

Additionally, Marquette makes much of the fact that when Dr. Varon wrote his expert report, he erroneously stated that Champ began suffering shortness of breath and requested medical care on October 24, rather than October 25.   It appears that Dr. Varon pointed out this mistake in his deposition and was examined by counsel at some length about this discrepancy.   (*See* Docket No. 49-7, at 14-20.)   When asked if this factual error affected his opinion, Dr. Varon testified that his opinion remained unchanged: "Honestly it doesn't change my opinion.   Not at all.   Because what this gentleman needed was to be taken to the closest emergency facility."   (Docket No. 49-7, at 18-19.)

The Court finds no reason to exclude Dr. Varon's opinions in this regard.   Dr. Varon is qualified to offer an opinion whether Champ likely would have survived had he received medical treatment sooner.   The facts that Dr. Varon is unfamiliar with river vessels, generally, and with the practical specifics of maritime operations go more appropriately to the weight of his testimony and are proper matters for cross-

examination; they do not, however, render Dr. Varon's testimony irrelevant or unreliable. The same is true for Marquette's argument relative to Dr. Varon's initially mistaken belief that Champ first requested medical care on October 24. Dr. Varon corrected this factual mistake, explained the basis for his opinion, and was questioned by counsel for Marquette as to his reasoning. Any further argument in this regard may appropriately be raised on cross-examination. Accordingly, this portion of Marquette's Motion will be denied.

### 3. Opinions concerning whether CPR should have been performed or was improperly performed

Lastly, Marquette moves to exclude Dr. Varon's opinions whether cardio-pulmonary resuscitation (CPR) should have been initiated or whether CPR was performed improperly on grounds of relevancy. In his expert report, Dr. Varon is critical of the RANDY ECKSTEIN's crew for failing to perform CPR:

> 6. I also find disturbingly inappropriate the fact that Mr. Champ had collapsed with no pulse and [was] not breathing, and *no one* was performing CPR prior to the arrival of the paramedics. Again, the difference between life and death is directly related to an early intervention.

(Docket No. 49-6, at 4 (emphasis in original).) Dr. Varon was questioned on this opinion during his deposition:

> Q.	All I'm asking you is what you get out of what you read? You put it in the report.
>
> A.	And what I wrote is that for reasons beyond my understanding this gentleman was not receiving cardiopulmonary resuscitation. And by that I mean chest compressions.
>
> Q.	Okay. Would chest compressions have -- well, let's just

put it this way.

Chest compressions would not have done anything to remove the obstruction in his lungs and his asthma, right?

A.   That's not necessarily true, sir.  It's good that you brought that up.   Actually chest compressions by themselves change the pressures within the thoracic cavity.   You actually do get ventilation by just compressing the chest. That's good.

Q.   Are you aware of any medical literature that says that when somebody has a near-fatal event that appropriate medical treatment for that asthma is chest compressions?

A.   No, sir. What I'm saying is that this gentleman had no pulse that we know about. Chest compressions were indicated. Those chest compressions may have helped with his ventilation, but his definite management needed to be airway intervention. That means intubate this gentleman.

Q.   So the fact that chest compressions were not done more likely than not did not contribute to his death, right?

A.   Let me just make it simpler for you.  By the time he ha[d] no pulse I don't believe that, more likely than not, chest compressions would have made any -- any kind of intervention would have made any difference.

Q.   He had to be intubated at that point?

A.   When we have no more pulse, the chances of him being alive would be only 30 percent.  So what he needed was to be transported as fast as they could.

(Docket No. 49-7, at 33-34.)  Dr. Varon further opined that paramedics were unable to intubate Champ until they reached the hospital because CPR had been improperly performed on Champ.   Noting that vomiting is the most common complication of improperly performed mouth-to-mouth resuscitation, (Docket No. 49-7, at 31), Dr. Varon explained how performing mouth to mouth without chest compressions can lead to the aspiration of gastric contents, (Docket No. 49-7, at 28).   On this point he also

explained: "The most common cause why you cannot intubate a patient is because you cannot see the vocal cords, and you don't see the vocal cords because there is junk in the back of the throat. And in this case it was vomitus." (Docket No. 49-7, at 28.) In this regard, he discussed the fact that Captain Boston performed mouth-to-mouth resuscitation without chest compressions and how this resulted in "a stomach that got distended, and the gentleman had aspiration." (Docket No. 49-7, at 28.) According to Dr. Varon, "That's the only explanation why this gentleman would have aspiration of gastric contents in his lungs." (Docket No. 49-7, at 28.)

Contrary to Marquette's argument, the Court finds that Dr. Varon's opinions in this regard are indeed relevant to Plaintiffs' claims. To the extent Marquette seeks to challenge Dr. Varon's testimony further, the appropriate avenue for doing so is cross-examination at trial. Therefore, this portion of Marquette's Motion also will be denied.

\* \* \*

For these reasons, the Court will grant in part and deny in part Marquette's Motion in Limine relative to Dr. Varon. Marquette's Motion will be granted as to the opinions expressed in numbered paragraphs 1 and 2 of Dr. Varon's expert report, (Docket No. 49-6, at 3); Marquette's Motion will be denied in all other respects.

### C.      Plaintiffs' Expert Edward Gras

In a separate Motion in Limine, Marquette moves to exclude Edward Gras, Plaintiffs' maritime expert, and to preclude him from testifying at trial. (Docket No. 48.) The thrust of Gras's proposed expert opinions is his criticism of the professional judgment used by Captain Boston and of Marquette's continuing to employ Champ aboard a river vessel despite his medical condition. (*See* Docket No. 48-6, at 2-3.) Gras

also criticizes Marquette for inadequately training its crews to properly recognize and handle emergency medical situations.  (*See* Docket No. 48-6, at 3.)

Marquette argues that Gras is not qualified to offer his proposed expert opinions in this matter.  Marquette also argues that all of Gras's expressed opinions are unreliable because they amount to little more than his uninformed recitation of Plaintiffs' theories of the case.

### 1.    Gras's qualifications

According to his resume, (Docket No. 48-6, at 5), and his affidavit submitted with Plaintiffs' Response, (Docket No. 61-2), Gras earned a Bachelor of Science in Marine Transportation from the United States Merchant Marine Academy in 1958, and subsequently received certifications from the Maritime Institute of Technology and Graduate Studies in marine tanker operations, shiphandling, stability, computer operation, navigation, radar, and hazardous materials.  He also has received a certification in labor law from the George Meany Institute.  (Docket Nos. 48-6, at 5; 61-2, at 2.)  From 1968 until 1995, he held an Unlimited Master's license issued by the USCG, which qualified him to command any vessel of any size and power on any body of water in the world.  (Docket No. 61-2, at 2.)  Gras states he has eleven years of deep sea experience serving on a range of vessels in the positions of Third Mate, Second Mate, Chief Mate, and Master.  He specifically states that he served as Master and Chief Mate on board freighters, tankers, container ships, and passenger vessels.  He also served as Port Captain for the Grace Line and Prudential Grace Line.  (Docket No. 61-2, at 2.)  Gras has held other positions relative to maritime industries, such as serving for fourteen years as a Maritime Labor Representative of the International Organization of

Masters, Mates & Pilots in the Port of New York.  (Docket No. 61-2, at 3.)  Gras also has worked in various capacities with the USCG and USCG Auxiliary providing safe-boating instruction in relation to pleasure boating as well as assisting with inspections of pleasure vessels. (Docket No. 61-2, at 3.)

Marquette argues that Gras is not qualified to offer expert opinions about the acts or omissions of Captain Boston or Marquette.  Marquette points out that regardless of his past ocean-going, or "blue water," experience, Gras has no training, education, or "brown water" experience relative to the operation of towing vessels on inland waterways; has never worked on a towboat or worked for a company that operates vessels on the inland-river system; has never served on board a vessel operating in the LMR area where this incident occurred (with the possible exception of one time in 1967); and has been retired from his shoreside management position in the blue-water maritime business for the past twenty-five years.  Marquette further points out that Gras's Unlimited Master's license expired in the late-1990s or early 2000 and has not been renewed. Marquette also directs the Court to the fact that during his twenty-five-year career as a maritime consultant, Gras has never been retained or qualified as an expert witness in an inland-river towing case.   Marquette further takes issue with the fact that during his deposition, Gras demonstrated a lack of familiarity with the inland-river towing business, the pertinent inland-river licenses held by Captain Boston, and Champ's duties and responsibilities as a mate on board a towboat.

Although Marquette's arguments as to Gras's qualifications are well-taken, the Court is satisfied that Gras is qualified to give most of his proposed opinions.  Rule 702 requires that an expert have "scientific, technical, or other specialized knowledge."  The

Sixth Circuit instructs that "[e]xperts are permitted wide latitude in their opinions, including those not based on firsthand knowledge, so long as 'the expert's opinion [has] a reliable basis in the knowledge and experience of the discipline.'" *Jahn C*, 233 F.3d at 388 (second alteration in original) (quoting *Daubert*, 509 U.S. at 592). Still, the "liberal interpretation of this requirement does not mean that a witness is an expert simply because he claims to be." *Price v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (citations and internal quotation marks omitted). The Court's role is to examine "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) (quoting *Berry v. City of Detroit*, 25 F.3d 1343, 1351 (6th Cir. 1994)). It is therefore necessary to examine Gras's qualifications in view of each opinion he proposes to give.

In his expert report, Gras offers four primary opinions, several of which have two subparts. First, he opines:

> In this instance the tug was in a section of the Mississippi River where it was not possible to have Mr. Champ immediately removed by ambulance for hospital treatment. [*a*] This delay of treatment cost Mr. Champ his life. [*b*] I believe Captain Boston did not recognize the seriousness of the situation. If Captain Boston had recognized the seriousness of the situation, he should have immediately launched the jon boat . . . so that Mr. Champ would have been transported to a hospital as quickly as possible.

(Docket No. 48-6, at 1-2.) Gras, who admittedly has no medical expertise, is not qualified to testify that "This delay of treatment cost Mr. Champ his life." However, the Court finds that Gras is qualified, based on his training and professional experience, to

express an opinion as to Captain Boston's use of discretion and professional judgment in handling Champ's medical emergency.

Second, Gras opines:

> [a] It is my opinion that Marquette breached the standard of care by failing to immediately take steps to evacuate Mr. Champ so that he could receive medical attention as soon as possible. [b] Based on my review of Dr. Varon's report, it appears that earlier medical attention would have most likely saved Mr. Champ's life.

(Docket No. 48-6, at 2.) Based on his professional experience and knowledge of the standards applicable to maritime transportation companies, generally, the Court is satisfied that Gras is qualified to offer an expert opinion as to the appropriateness of Marquette's response to Champ's request for medical treatment. Again, however, Gras is not qualified to offer a medical opinion or opine whether "earlier medical attention would have most likely saved Mr. Champ's life."

Gras's third opinion, in relevant part, states:

> It is also my opinion that Marquette Transportation breached the standard of care by employing Mr. Champ aboard the Randy Eckstein because the Randy Eckstein was customarily deployed on long runs up and down the Mississippi River where there are stretches with no port nearby. As a result, if Mr. Champ became ill, it would be difficult to transport him to shore for medical treatment. As a valued employee, Mr. Champ could have and should have been assigned to a job ashore or on a tug that remains in one harbor. The previous attacks were a warning sign that Mr. Champ might need immediate medical treatment and should [not] have been assigned to the Randy Eckstein. Shoreside management has an obligation to take whatever steps that are necessary so as not to place its employees in jeopardy. Common sense dictates that in view of Mr. Champ's medical history he did not belong aboard the Randy Eckstein.

(Docket No. 48-6, at 2-3.)  The essential question Gras's opinion seeks to answer is whether a prudent maritime transportation employer would have employed a worker with Champ's known medical condition on a vessel that operated under the circumstances of the RANDY ECKSTEIN.  Although the admissibility of this opinion is likely moot in light of the Court's conclusions *infra* Part II.D.3, it appears to the Court that based on Gras's professional experience—particular his experience as a port captain, which required him to regularly assess crew members' physical limitations and assign them to jobs based on their fitness—the Court finds that he would otherwise be qualified to express an opinion in this regard.

Fourth and finally, Gras opines:

> Based on the materials reviewed, I also believe that Marquette Transportation provided inadequate training to its crews causing Captain Boston and/or the crew of the Randy Eckstein not to appreciate the seriousness of Mr. Champ's condition or the need to provide immediate medical treatment.

(Docket No. 48-6, at 3.) As best the Court can tell, neither Marquette's Motion nor its Reply addresses Marquette's challenge to this proposed opinion with any specificity. As such, the Court finds no reason to exclude this opinion for Gras's lack of qualification.

In sum, many of Marquette's challenges to Gras's qualifications, while not without merit, go more to the weight of his testimony and do not warrant exclusion of his proposed opinions.  Although Gras has an admitted lack of familiarity with the particulars of the inland-river towing business, his general maritime expertise provides a sufficient foundation for him to answer the specific questions to which his opinions are directed.  *See Dilts v. United Grp. Servs., LLC*, 500 F. App'x 440, 444 (6th Cir. 2012)

(holding that an expert's "lack of familiarity [with some aspects of a given industry] affects the witness' credibility, [and] not his qualifications to testify." (second alteration in original) (quoting *Davis v. Combustion Eng'g Inc.*, 742 F.2d 916, 919 (6th 1984))); *accord Mactec, Inc. v. Bechtel Jacobs Co.*, 346 F. App'x 59, 77-78 (6th Cir. 2009); *Barreto*, 268 F.3d at 333.

### 2.    Reliability of Gras's opinions

Marquette further challenges several of Gras's opinions as speculative and uninformed, arguing that such opinions should be excluded on grounds of reliability. First, Marquette seeks to exclude Gras's opinion that the "delay in treatment cost Mr. Champ his life."   As discussed above, Gras is not qualified to render this opinion.  And even if he were, this vague, unsubstantiated opinion lacks a reliable basis in his professional knowledge and experience.  It therefore warrants exclusion for this reason as well.

Second, Marquette argues that Gras's opinion that "Captain Boston did not recognize the seriousness of the situation" also should be excluded.  Marquette urges that this opinion "is nothing more than second guessing . . . Captain Boston's judgment call."  (Docket No. 48-1, at 12.)   Though Marquette presents a compelling argument, it more appropriately goes to Gras's qualifications than to the reliability of his opinions. In forming this opinion, Gras examined, among other things, the deposition testimony of Captain Boston and Relief Mate Fulton.  It appears to the Court that Gras's review of these materials, together with his professional knowledge and experience, provide a sufficiently reliable basis from which he may offer an opinion as to Captain Boston's professional judgment in handling Champ's medical emergency.

Third, Marquette challenges Gras's opinion that Marquette was negligent in allowing Champ to continue working on board the RANDY ECKSTEIN despite his medical condition. Marquette argues that this opinion should be excluded for lack of a factual foundation and because it is not the product of any specialized or technical knowledge. Again, Marquette presents a compelling argument why Gras's testimony ought to be excluded. The Court, however, is not convinced that this opinion necessarily fails the reliability standards of Fed. R. Evid. 702 and *Daubert*. Based on the information he reviewed in forming his opinions, Gras was aware of Champ's previous asthma attacks and was familiar with the fact that the RANDY ECKSTEIN was customarily deployed on long runs where immediate medical access might not always be available. Furthermore, based on his professional experience, Gras is familiar with management procedures for assigning particular crew members to particular duties based on their limitations and fitness. Though the admissibility of this opinion is likely moot in light of the Court's conclusions *infra* Part II.D.3, the Court cannot conclude that it should be excluded on the basis of reliability.

* * *

For these reasons, the Court will grant in part and deny in part Marquette's Motion in Limine relative to Gras. Marquette's Motion will be granted as to Gras's opinions that "[the] delay in treatment cost Mr. Champ is life" and that "earlier medical attention would have most likely saved Mr. Champ's life," (Docket No. 48-6, at 1-2); Marquette's Motion will be denied in all other respects.

**II.**    **Motions for Judgment on the Pleadings and for Summary Judgment**

    **A.**    **Standards for Judgment on the Pleadings Under Rule 12(c) and for Summary Judgment Under Rule 56**

Motions for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) are adjudicated using the same standard as motions to dismiss under Rule 12(b)(6). *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (citing *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 389 (6th Cir. 2007)). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Id.* (quoting *S. Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 479 F.2d 478, 480 (6th Cir. 1973)). However, the Court "need not accept as true legal conclusions or unwarranted factual inferences." *Id.* at 581-82 (quoting *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999)). Thus, "[a] Rule 12(c) motion is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Id.* at 582 (quoting *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991)). "[A] court may accept 'matters outside the pleadings,' but in doing so it generally must treat the motion 'as one for summary judgment under Rule 56." *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008) (quoting Fed. R. Civ. P. 12(d)).

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[N]ot every issue of fact or conflicting inference presents a genuine

issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; he must present evidence on which the trier of fact could reasonably find for him. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "[T]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Still, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

### B. Motion for Judgment on the Pleadings of Certain Claims

Marquette moves, pursuant to Rule 12(c), for judgment on the pleadings as to certain claims asserted in Plaintiffs' Amended Complaint. (Docket No. 39.) Specifically, Marquette moves the Court to dismiss (1) claims brought directly by Champ's daughters, Sias and L.S., on grounds that only the decedent's personal representative, not his beneficiaries, is entitled to file suit; (2) all individual claims of

Mrs. Champ, on grounds that Mrs. Champ is entitled to file suit only as the representative of Champ's estate and is not entitled to assert any individual claims on behalf of herself; and (3) Plaintiffs' claims for loss of future wages and earning capacity, loss of fringe benefits, and loss of society and companionship, on grounds that such damages are not recoverable under the Jones Act or the general maritime law where the Jones Act seaman is deceased. (*See* Docket No. 39.) Plaintiffs have responded in opposition. (Docket No. 52.) Plaintiffs' Response at Docket No. 52, however, is an identical duplicate of the argument presented in its Response at Docket No. 51, which responds to Marquette's Motion for Partial Summary Judgment at Docket No. 42. As such, Plaintiffs' Response inexplicably fails address any of the issues raised in Marquette's instant Motion for Judgment on the Pleadings of Certain Claims.

### 1. Claims brought directly by Champ's daughters and by Mrs. Champ, individually, and on behalf of Champ's estate

The Jones Act, 46 U.S.C. § 30104 (formerly codified at 46 U.S.C. App. § 688), provides two remedies in the event of a seaman's death: (1) a wrongful death action, which confers in designated beneficiaries a right to recover for the loss of their decedent; and (2) a survival action, which permits recovery of damages the decedent could have recovered had he not died. *See generally* Robert Force & Martin J. Norris, *The Law of Seamen* § 29:17 (5th ed. 2012). The Act generally limits Jones Act wrongful death and survival actions to the decedent's personal representative. *See* 46 U.S.C. § 30104 ("[I]f the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law . . . against the employer.") As such, the right to bring an action for wrongful death rests exclusively with the decedent's personal representative. *See Civil v. Waterman S.S. Corp.*, 217 F.2d 94, 98 (2d Cir.

1954) ("[O]nly the personal representative, and not the beneficiary, has the right to sue under [the Jones Act]." (citing *Am. R.R. Co. of Porto Rico v. Birch*, 224 U.S. 547 (1912))); *see also* Force & Martin, *supra*, § 29:17 ("Only the personal representative and not the beneficiary has the right to maintain suit for wrongful death under the Jones Act.")  This right is further codified in the Federal Employers Liability Act (FELA), upon which the Jones Act is based.  FELA specifically provides, in relevant part:

> Any right of action given by this chapter to a person suffering injury shall survive to his or her personal representative, for the benefit of the . . . children of such employee, and, if none, then of such employee's parents; . . . but in such cases there shall be only one recovery for the same injury.

45 U.S.C. § 59.  The rights and remedies given to railway employees by FELA are expressly made applicable to seamen by the Jones Act.  *See* 46 U.S.C. § 30104 ("Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section.")  The personal representative does not act on behalf of the seaman's estate but instead for the survivors named in the statute, with a right to recover as trustee of the statutorily designated beneficiaries.  *See Lindgren v. United States*, 281 U.S. 38, 41 (1930); *see also Hassan v. A.M. Landry & Son, Inc.*, 321 F.2d 570, 571 (5th Cir. 1963) ("If the plaintiff as administratrix is entitled to recovery under the Jones Act, her recovery would not be on behalf of the estate but solely as trustee for the designated survivors, that is, in this case the . . . children."). Except in two narrow exceptions inapplicable here, "[t]he personal representative is undeniably the court-approved executrix or administratrix of the decedent's estate." *Daigle v. Bell Helicopter Textron*, 1987 WL 14655, at *1 (E.D. La. Nov. 5, 1987) (citing *Briggs v. Walker*, 171 U.S. 466 (1898)).

There seems to be no dispute that Mrs. Champ is Champ's personal representative. As such, only Mrs. Champ has the right to maintain suit against Marquette. It follows that Champ's daughters, though they may have claims as designated beneficiaries under the statute, cannot assert individual claims against Marquette; instead, their claims must be asserted on their behalf by the decedent's personal representative, Mrs. Champ. Accordingly, the Court will grant this portion of Marquette's Motion and dismiss the claims brought directly by Sias and L.S.

Furthermore, although Mrs. Champ has the exclusive right to maintain suit against Marquette, her right to do so is in her capacity as personal representative, not individually. The Act creates a right of action on behalf of the personal representative for the benefit of three specified classes of beneficiaries: (1) the surviving spouse and children of the deceased; (2) if there is no spouse and no children surviving, then the deceased's parents; and (3) if there are no survivors of the first two classes, then the deceased's next of kin who is dependent on the deceased. *See* 45 U.S.C. §§ 51, 59; *see generally* Force & Norris, *supra*, § 29:18. Though the statute creates three potential classes, the liability to these classes is in the alternative—that is, "[t]he beneficiary of that liability can be one of the three, but not to the several classes collectively." Force & Norris, *supra*, § 29:18 (citing *Gillespie v. U.S. Steel Corp.*, 379 U.S. 148, 156 (1964)); *see also Hassan*, 321 F.2d at 571 ("[T]he recovery for the death of an employee is for the benefit of the surviving widow and children of the employee, if any, to the exclusion of his parents and other beneficiaries."); *cf. Calton v. Zapata Lexington*, 811 F.2d 919, 921-22 (5th Cir. 1987) (discussing *Hassan* and other cases to conclude that "a beneficiary cannot bring suit apart from the personal representative").

Given that Champ is survived by two daughters who fall into the first class created by the statute, the members of the remaining classes—including Champ's mother, Mrs. Champ—are precluded from recovering individual damages. Thus, Mrs. Champ cannot maintain her individual claims against Marquette, nor can she maintain any claim on behalf of the estate. Instead, her only claims are as the personal representative of Champ, with such claims being for the benefit of Champ's two daughters, the statutory beneficiaries. Therefore, the Court will grant this portion of Marquette's Motion and dismiss Mrs. Champ's individual claims, as well as those brought by her on behalf of Champ's estate. [3]

### 2. Claims for loss of future wages and earning capacity, loss of fringe benefits, and loss of society and companionship

As noted above, the Jones Act provides two types of actions in the event of a seaman's death: (1) a wrongful death action for damages suffered by the designated beneficiaries, and (2) a survival action, which permits recovery of damages the decedent could have recovered had he not died. *See generally* Force & Norris, *supra*, § 29:17.

With regard to a wrongful death action, the law is clear that nonpecuniary damages such as for loss of society are not recoverable under either a Jones Act negligence theory or a general maritime law unseaworthiness theory. *See, e.g.*, *Miles v. Apex Marine Corp.*, 498 U.S. 19, 31-33 (1989); *Szymanski v. Columbia Transportation*

---

[3] Although Plaintiffs' Amended Complaint makes clear that "[t]his claim is maintained under the Jones Act," (Docket No. 27, at 1), they also include a general allegation that the RANDY ECKSTEIN was unseaworthy, (Docket No. 27, at 3). Their Amended Complaint does not, however, specify any particular unseaworthy condition. (*See* Docket No. 27, at 3.) Regardless, the Court's conclusions in this Part apply equally to the extent that Plaintiffs, by their unseaworthiness claim, seek a wrongful death remedy under the general maritime law pursuant to *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375 (1970). *See generally Tidewater Marine Towing, Inc. v. Dow Chem. Co.*, 689 F.2d 1251, 1253 (5th Cir. 1982); Robert Force, *Admiralty and Maritime Law* 129 (2d ed. 2013).

*Co.*, 154 F.3d 591, 595-597 (6th Cir. 1998) (en banc); *Billingsley v. Alberici Constructors, Inc.*, 2014 WL 1248019, at *3-4 (W.D. Ky. Mar. 25, 2014). As such, Plaintiffs cannot maintain their claim for loss of society and companionship under either theory.

With regard to a survival action, damages for the decedent's predeath pain and suffering are available under both the Jones Act and the general maritime law. *See* Force & Norris, *supra*, § 29:17. Such damages are limited, however, to the decedent's personal loss and suffering before he died. *Id.* In *Miles v. Apex Marine Corp.*, the Supreme Court unequivocally held that a "survival action cannot include recovery for decedent's lost future earnings." 498 U.S. at 37. The Court explained that if recovery for such damages was allowed, it would "be duplicative of recovery by dependents for loss of support in a wrongful death action." *Id.* at 35. The rule set forth in *Miles* remains the rule today. *See, e.g.*, *Ainsworth v. Caillou Island Towing Co.*, 2013 WL 3216068, at *5-6 (E.D. La. June 24, 2013). Accordingly, Plaintiffs[4] cannot maintain their claim for loss of future wages and earning capacity.

Finally, though it is not entirely clear precisely what "fringe benefits" Plaintiffs are claiming, the rationale above applies equally to their claim for loss of fringe benefits. Such benefits are not recoverable in a survival action because they are not included in the losses suffered by the decedent in his lifetime. Such benefits also are not recoverable in a wrongful death action because they would be duplicative of the permissible recovery for loss of support. Thus, the Court is similarly satisfied that Plaintiffs cannot maintain their claim for loss of fringe benefits.

---

[4] Although the Court has found that the only claims that may proceed are those brought by Mrs. Champ, as his personal representative, for the benefit of his two daughters, the Court will, for purposes of simplicity and consistency, continue to refer to "Plaintiffs" in the plural for the remainder of this Opinion.

\* \* \*

For these reasons, and in the absence of any meaningful response by Plaintiffs, the Court will grant Marquette's Motion for Judgment on the Pleadings of Certain Claims and dismiss the direct claims filed by Champ's daughters, Sias and L.S; the claims filed by Mrs. Champ, individually, as well as any claims she purports to file on behalf of Champ's estate; and the Plaintiffs' claims for loss of society and companionship, loss of future wages and earning capacity, and loss of fringe benefits.

### 3. Evidence of Mrs. Champ's Alleged Damages

In a separate Motion in Limine, Marquette moves to exclude evidence of Mrs. Champ's alleged damages, on grounds that she is not entitled to assert a claim for damages on her own behalf.  (Docket No. 40.)  As discussed above, because Champ was survived by two daughters, Mrs. Champ falls into a subsequent, alternative class of beneficiaries and thus is not entitled to assert a claim for individual damages. Marquette argues that because she is not a statutory beneficiary, the Court should exclude any testimony or other evidence by Mrs. Champ that would support the allegation that she is entitled to individual damages.   (Docket No. 40-1, at 2-4.) Plaintiffs respond, arguing that it is premature for the Court to entertain a motion in limine at this time.  (Docket No. 53-1, at 2.)  Plaintiffs reason that because Mrs. Champ falls within an alternate class of statutory beneficiaries, "if, at the time of trial, she is the only member entitled to take under the Act, then she is entitled to present any and all claims she may have."  (Docket No. 53-1, at 2.)

Having found that Mrs. Champ is not entitled to assert a claim for individual damages, it follows that any testimony or other evidence of such damages is not

relevant and appropriately excludable under Fed. R. Evid. 402. Contrary to Plaintiffs' suggestion, it appears there is no circumstance under which Mrs. Champ will ever be entitled to assert claims as a statutory beneficiary. 45 U.S.C. § 59, titled "Survival of right of action of person injured," provides in pertinent part:

> Any right of action given by this chapter to a person suffering injury shall survive to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee, and, if none, then of such employee's parents . . . but in such cases there shall be only one recovery for the same injury.

The law is clear that the cause of action accrues at the time of the decedent's death. *Reading Co. v. Koons*, 271 U.S. 58, 62-64 (1926). Moreover, the cause of action "accrues only in the alternative to one of the possible classes of beneficiaries." *Wade v. Rogala*, 270 F.2d 280, 284 (3d Cir. 1959) (citing *Chi. B. & Q. R.R. Co. v. Wells-Dickey Trust Co.*, 275 U.S. 161 (1927)). Therefore, any cause of action accrued at the time of Champ's death in his two surviving daughters, who represent the sole class of beneficiaries entitled to recovery, and any claims they have would pass to their estate at death, not to Mrs. Champ. *See Wade*, 270 F.2d at 284 ("[S]ince the decedent was survived by his father, he constituted the sole class beneficiary of the action . . . . Any recovery, in view of the father's death, would be received on behalf of the father's estate."). Thus, the Court disagrees that the adjudication of this Motion is premature.

Marquette also argues that the Court should preclude Mrs. Champ from offering any testimony as to what she believes Marquette allegedly did wrong, on grounds that she has no firsthand knowledge regarding Champ's condition at the time of his death or what occurred on board the RANDY ECKSTEIN, and that any such testimony would be based on hearsay or speculation. (Docket No. 40-1, at 4.) Plaintiffs do not respond

to this portion of Marquette's Motion. (*See* Docket No. 53.) It is clear to the Court, based on her deposition testimony, that Mrs. Champ has no firsthand knowledge of what happened on the night of Champ's death. (*See* Docket No. 40-2.) She testified that she had not spoken to Champ for roughly a week before his death. (Docket No. 40-2, at 6.) Thus, any fact or opinion testimony she might offer in regard to Champ's medical condition at the time of his death, what occurred on board the RANDY ECKSTEIN the night of his death, or the appropriateness of Marquette's actions are properly excludable under Fed. R. Evid. 602 and 701.

For these reasons, and consistent with the foregoing, the Court will grant Marquette's Motion in Limine.

**C.** **Motion for Partial Summary Judgment as to Certain Categories of Damages**

In a related Motion, Marquette moves for partial summary judgment on the types of damages that Plaintiffs are allowed to recover. (Docket No. 42.) Specifically, Marquette seeks dismissal of Plaintiffs' claims for loss of services and support; loss of nurture, guidance, care, and instruction; loss of enjoyment of life; loss of future pecuniary support; emotional distress and mental anguish; and Plaintiffs' catch-all claim for "all other damages recoverable under the law." (Docket No. 42-2.) Plaintiffs' Response addresses the categories of loss of services and support, and loss of nurture, guidance, care, and instruction. (Docket No. 51-1, at 6-9.) Plaintiffs' Resposnse also address their claim for "all other damages recoverable under the law." (Docket No. 51-1, at 10.) Plaintiffs do not, however, respond to Marquette's Motion as it relates to their claims for loss of enjoyment of life, loss of future pecuniary support, and emotional distress and mental anguish. (*See* Docket No. 51-1.)

### 1.    Loss of services and support

Certainly, loss of support and loss of services are recoverable under both the Jones Act and the general maritime law.  *See Neal v. Barisich, Inc.*, 707 F. Supp. 862, 868-69 (E.D. La. 1989).  However, there can be no award for such damages "when the only evidence to support it is speculative or purely conjectural."  *Id.* at 869 (quoting *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1235 (5th Cir. 1986)).

Marquette recognizes that loss of support and loss of services are recoverable in a wrongful death action.  (Docket No. 42-2, at 6-7.)  Marquette argues, however, that any claims for support beyond the amount of court-ordered child support is purely speculative and without evidentiary support.  (Docket No. 42-2, at 7.)

It appears to the Court that Plaintiffs have presented some evidence, by way of Sias's and Mrs. Champ's deposition testimony, showing that Champ provided some additional support to Sias.  As such, Sias's loss of support claim is sufficient to withstand summary judgment, and the amount of any such loss is appropriately reserved for trial.

However, it does not appear that Plaintiffs have presented any specific evidence of support provided by Champ to his minor daughter, L.S., beyond court-ordered child support.  In regard to L.S.'s claim for loss of support, Plaintiffs' Response merely states, in conclusory fashion: "In addition, L.S., a minor child, also suffered loss of support . . . when her father passed away."  (Docket No. 51-1, at 9.)  As noted above, to survive summary judgment, a party asserting that a fact is genuinely disputed must support that assertion by citing to particular parts of materials in the record. Fed. R. Civ. P. 56(c)(1). Plaintiffs have not done so here.  In the absence of evidence to the contrary, any support

L.S. received or might have received in the future beyond the amount Champ provided through court-ordered child support payments is purely speculative. As such, Marquette's Motion will be granted insofar as L.S. cannot maintain a loss of support claim beyond the amount of court-ordered child support.

Next, Marquette argues that, in light of the fact that neither of Champ's daughters lived with him at the time of his death, there is no evidence to support any claim for loss of services. (Docket No. 42-2, at 7-8.) Plaintiffs' Response does not directly address this issue; instead, Plaintiffs merely argue that Champ's daughters' loss of services should be reserved for the trier of fact. (*See* Docket No. 51-1, at 9.)

To recover for loss of services, a claimant must present some evidence assigning a value to the services performed by the decedent. *In re Adventure Bound Sports, Inc.*, 858 F. Supp. 1192, 1201 (S.D. Ga. 1994) (citing *Ivy v. Security Barge Lines*, 585 F.2d 732, 740 (5th Cir. 1978); *Martinez v. P.R. Marine Mgmt.*, 755 F. Supp. 1001, 1008 (S.D. Ala. 1990)). Here, Plaintiffs have come forward with no evidence of any services performed by Champ, nor have they presented any evidence assigning a value to any such services. As such, Plaintiffs' claim for loss of services is insufficient to survive summary judgment.

### 2. Loss of nurture, guidance, care, and instruction

Loss of nurture is essentially a loss of services for the decedent's child, *see Sea-Land Servs., Inc. v. Gaudet*, 414 U.S. 573, 585 (1974), and is defined as "the pecuniary value of what the decedent might reasonably have been expected to give his children during their minority," *Thompson v. Camp*, 163 F.32d 396, 403 (6th Cir. 1947) (citing *Norfolk & W. Ry. Co. v. Holbrook*, 235 U.S. 625, 629 (1915)); *see also Estate of Zarif v.*

*Korean Airlines Co.*, 836 F. Supp. 1340, 1349 (E.D. Mich. 1993). "An award for loss of nurture does not extend to compensation for grief resulting from the loss of the warm and loving parental relationship. It is a more limited and more measurable award for loss of valuable services in the nature of instruction, training and guidance." *Red Star Towing & Transp. Co. v. Ming Giant*, 552 F. Supp. 367, 377 (S.D.N.Y. 1982).

Loss of nurture damages generally are recoverable only by a decedent's children up until the age of majority. *See De Centeno v. Gulf Fleet Crews, Inc.*, 798 F.2d 138, 141-42 (5th Cir. 1986) (affirming an award of loss of nurture damages to decedent's minor children until they reached the age of majority); *Solomon v. Warren*, 540 F.2d 777, 789 (5th Cir. 1976) ("The opportunity and necessity for [intellectual, moral, and physical] training and guidance diminish in the normal child as he reaches majority and leaves his parents' roof for college or for his own separate home."); *Estate of Zarif*, 836 F. Supp. at 1350 (rejecting adult son's claim for loss of nurture). As another district court in this circuit noted:

> Loss of nurture damages are extended to adult children only in certain circumstances: "Whatever may be the rule for minor children, it is clear that those who have reached their majority must be very specific to show that their parents' guidance had a pecuniary value beyond the irreplaceable values of companionship and affection."

*Estate of Zarif*, 836 F. Supp. at 1350 (quoting *First Nat'l Bank in Greenwich v. Nat'l Airlines, Inc.*, 288 F.2d 621, 624 (2d Cir. 1961)). Courts consider "loss of nurture as 'awards for financial loss to dependents.'" *Id.* (quoting *Moore-McCormack Lines, Inc. v. Richardson*, 295 F.2d 583, 598 n.9A (2d Cir. 1961)). Therefore, "[i]n the absence of evidence that an adult child is either dependent upon or had any reasonable grounds for

expecting any pecuniary benefit from a continuance of the decedent's life, a recovery on behalf of such child is excluded." *Id.* (quoting *Kozar v. Chesapeake & Ohio Ry.*, 449 F.2d 1238, 1243 (6th Cir. 1971))

The parties seem to agree that damages for loss of nurture, guidance, care, and instruction are recoverable under the general maritime law but not under the Jones Act. (*See* Docket Nos. 42-2, at 8; 51-1, at 9); *see also Morvant v. Constr. Aggregates Corp.*, 570 F.2d 626, 633 n.8 (6th Cir. 1978). The parties disagree, however, whether Champ's daughters are entitled to any such damages.

Sias, born in 1994, was just a few months away from her eighteenth birthday at the time of Champ's death in 2011. Sias lived with her mother in Texas her entire life, with the exception of one year when she was six years old. (*See* Docket No. 42-3, at 3.) She testified that while she was a child she visited her father in Mississippi "about once or twice a year." (Docket No. 42-3, at 5.) Sias, now twenty years old and a high school graduate, is presently employed as a correctional officer at a prison in Texas. (Docket No. 42-3, at 2.) Plaintiffs direct the Court to no testimony by Sias that would support an award for loss of nurture past the age of majority, nor can the Court locate any evidence in the record to support such an award. In short, there has been no specific showing that Sias has or will suffer during her majority from the loss of Champs' nurture beyond "the irreplaceable values of companionship and affection." *See Solomon*, 540 F. 2d at 790; *First Nat'l Bank in Greenwich*, 288 F.2d at 624. As such, any claim by Sias for loss of nurture, guidance, care, and instruction must be limited to the period between Champ's death and when she reached the age of majority.

The same holds true for Champ's minor daughter L.S.  To the extent L.S. can prove entitlement to loss of nurture damages, Plaintiffs have presented no evidence that such damages should extend beyond the age of majority.

Accordingly, the Court concludes that any recover for loss of nurture by either Sias or L.S. is contingent on their proving unseaworthiness and is limited to the period between Champ's death and the time each reached or reaches the age of majority.

### 3.        Loss of enjoyment of life

It is unclear from their Amended Complaint whether Plaintiffs are seeking damages for their own loss of enjoyment of life or for Champ's.  Because they have not responded to this portion of Marquette's Motion, their position on this issue remains unclear.  Regardless, they are not entitled to such damages in either case.

To the extent Plaintiffs are seeking such damages based on Champ's loss of enjoyment of life, they are seeking survival damages.  As noted above, damages for the decedent's predeath pain and suffering are available under both the Jones Act and the general maritime law, but are limited to the decedent's personal loss and suffering before he died.  Thus, because Plaintiffs are entitled to recover only for Champ's losses prior to his death, they are not entitled to recover for Champ's loss of enjoyment of life.

To the extent Plaintiffs are seeking damages for their own loss of enjoyment of life in a wrongful death action, the law is clear that such nonpecuniary damages are not recoverable under either the Jones Act or the general maritime law.  *See, e.g.*, *Miles*, 498 U.S. at 31-33; *Szymanski*, 154 F.3d at 595-597; As such, Plaintiffs cannot recover damages for their own individual loss of enjoyment of life.

### 4.       Loss of future pecuniary support

This category of damages has been discussed *supra* Part II.C.1, and the Court's reasoning and conclusions there apply with equal force to Plaintiffs' claim for loss of future pecuniary support.

### 5.       Loss of society and companionship

This category of damages has already been discussed in relation to Marquette's Motion for Judgment on the Pleadings as to Certain Claims.  (Docket No. 39.)  As the Court concluded *supra* Part II.B.2, nonpecuniary damages are not recoverable under either the Jones Act or the general maritime law, and thus Plaintiffs cannot maintain their claim for loss of society and companionship under either theory.  *See, e.g.*, *Miles*, 498 U.S. at 31-33; *Szymanski*, 154 F.3d at 595-597.

### 6.       Emotional distress and mental anguish

It is again unclear whether Plaintiffs are seeking damages for their own emotional distress and mental anguish or for Champ's.  And, again, because they have not responded to this portion of Marquette's Motion, their position on this issue remains unclear.  As discussed *supra* Part II.B.2, damages for the decedent's predeath pain and suffering are available under both the Jones Act and the general maritime law. Marquette does not contest this point.  (*See* Docket No. 42-2, at 10-11.)  However, as discussed in several instances above, nonpecuniary damages are not recoverable under either a Jones Act negligence theory or a general maritime law unseaworthiness theory. Thus, to the extent Plaintiffs are seeking damages for their own emotional distress and mental anguish, such damages are not recoverable as a matter of law.

### 7. **"All other damages recoverable under the law"**

It is unclear from their Amended Complaint exactly what damages Plaintiffs seek under this catch-all category. Marquette's Motion generally argues that Plaintiffs are not entitled to any additional nonpecuniary damages. Marquette further argues that to the extent Plaintiffs seek loss of inheritance damages, they have not presented evidence to support such an award. (Docket No. 42-2, at 11.) To this end, Marquette insists that there is no evidence that Champ had a "history of accumulating property," pointing out that although there is evidence of a 401(k) plan, Mrs. Champ has withdrawn the entire amount of that plan leaving no balance. (Docket No. 42-2, at 11.) Thus, Marquette urges that Plaintiffs have produced no evidence of "a reasonable expectation of pecuniary benefit" through any inheritance. (Docket No. 42-2, at 11.) Plaintiffs respond, stating: "Plaintiffs would show that the evidence . . . of a 401K account, is sufficient to show that [Champ] did in fact accumulate property. In as much as Plaintiffs will present evidence, some of which is included in the testimony concerning pecuniary benefit above, they will show they had a reasonable expectation of pecuniary benefit through inheritance." (Docket No. 51-1, at 10.)

Loss of prospective inheritance has been recognized as a proper element of damages for qualified beneficiaries in both Jones Act and *Moragne* wrongful death actions. *See In re Cambria S.S. Co.*, 505 F.2d 517, 523-24 (6th Cir. 1974) (referencing *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 387 (1970)). Insofar as Plaintiffs have failed to point to any specific evidence showing that Champ had accumulated any property as of the time of his death, the Court doubts whether they ultimately would be entitled to such damages. However, because there appears to be some evidence,

however meager, that would support such a claim, the Court is hesitant at this juncture to grant summary judgment as to this form of damages. Thus, to the extent Plaintiffs can prove that Champ did, in fact, accumulate property and that they had a reasonable expectation of pecuniary benefit through inheritance, this category of damages is properly recoverable.

To the extent Plaintiffs intend to seek other damages under this catch-all category aside from those asserted in the Amended Complaint, they have come forward with no evidence to support any such unspecified damages.

**D.      Motion for Judgment on the Pleadings or, Alternatively, for Partial Summary Judgment Relative to Particular Negligence Claims**

Marquette next moves for judgment on the pleadings or, in the alternative, for partial summary judgment on Plaintiffs' claims that Marquette was negligent in "[f]ailing to adequately evaluate [Champ's] medical condition to determine whether he could safely perform his job," and in "[a]llowing [Champ] to continue working aboard Defendant's vessel when Mr. Champ's medical condition placed him at risk of serious injury or death." (Docket No. 43 (referencing Docket No. 27, at 3, ¶¶ 11(i) &(j)).) Marquette moves for judgment on the pleadings, arguing that these claims seek to impose a duty on Marquette that does not exist under the Jones Act. Alternatively, Marquette moves for partial summary judgment, arguing that even if there were such duties, as a matter of law, Marquette did not breach those duties.

Marquette separately moves for partial summary judgment on Plaintiffs' claim that Marquette was negligent in "[f]ailing to provide adequate and immediate medical attention." (Docket No. 43-1, at 27-34 (referencing Docket No. 27, at 3, ¶ 11(g)).)

### 1. Negligence claims under the Jones Act

The Jones Act provides a seaman with a negligence-based cause of action against an employer. *See* 46. U.S.C. § 30104. Prior to its enactment, a seaman injured in the service of a vessel by the negligence of the vessel's owner was entitled only to the remedy of maintenance and cure, unless the injury resulted directly from an unseaworthy condition of the vessel. *See generally* Robert Force, *Admiralty and Maritime Law* 96 (2d ed. 2013). Because the defenses of contributory negligence, assumption of risk, and the fellow servant doctrine were available to vessel owners, a seaman was precluded from recovering damages in a negligence action. *See id.* (referencing *Chelentis v. Luckenbach S.S. Co.*, 247 U.S. 372 (1918); *The Osceola*, 189 U.S. 158 (1903)). Congress responded to this situation with the Jones Act, which is remedial in nature and liberally construed in favor of the injured seaman. *See id.* (citing *Fisher v. Nichols*, 81 F.3d 319 (2d Cir. 1996)).

As noted above, the Jones Act incorporates the provisions of FELA. *See* 46 U.S.C. § 30104 ("Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section."); *Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 598 (6th Cir. 2001) ("Under the Jones Act, seamen are afforded rights parallel to those given to railway employees under [FELA].") FELA provides, in pertinent part:

> Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances,

> machinery, track, roadbed, works, boats, wharves, or other
> equipment.

45 U.S.C. § 51. Therefore, in suits under the Jones Act, the court must determine whether the evidence justifies the conclusion that the employer was negligent and that the employer's negligence played any part, however slight, in producing the injury to the seaman. *Perkins*, 246 F.3d at 598 (citing *Sweeney v. Am. S.S. Co.*, 491 F.2d 1085, 1089 (6th Cir. 1974)). It follows that a seaman must demonstrate proof of negligence— *i.e.*, duty and breach of that duty—in order to maintain a Jones Act claim. *Id.* (citing *Jacob v. City of N.Y.*, 315 U.S. 752, 755 (1942)). "Whether an employer is negligent is determined under the 'ordinary prudence' standard normally applicable in negligence cases." *Id.* (citing *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997)). But once he has proven negligence, he need only show that his employer's negligence is the cause, in whole or in part, or his injuries; thus, "[i]n essence, there is a reduced standard for causation between the employer's negligence and the employee's injury." *Id.* (citing *Gautreaux*, 107 F.3d at 335); *see also Daughenbaugh v. Bethlehem Steel Corp.*, 891 F.2d 1199, 1204 (6th Cir. 1989).

> **2. Claims that Marquette was negligent by failing to adequately evaluate Champ's medical condition and by allowing Champ to continue working aboard the vessel: *Duties owed***

To recover on their Jones Act negligence claim, Plaintiffs "must first establish 'the breach of a duty to protect against foreseeable risks of harm.'" *Perkins*, 246 F.3d at 599 (quoting *Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432, 437 (4th Cir. 1999)). Whether a duty exists is purely a question of law. *E.g. Fulk v. Ill. Cent. R.R.*

*Co.*, 22 F.3d 120, 125 (7th Cir. 1994); *Davies v. Collins*, 349 F. Supp. 62, 66 (E.D. Ky. 1972).

A review of the pertinent case law compels the conclusion that the Jones Act imposes no duty on a maritime employer to monitor or evaluate an employee's health. Although many of these decisions arose under FELA, they are equally applicable in the context of the Jones Act. For example, in *Fulk v. Illinois Central R.R. Co.*, the Seventh Circuit, relying on decisions by the First and Eighth Circuits, recognized the general rule that "a railroad has no general duty to ascertain whether an employee is physically fit for his job. 22 F.3d at 125 (discussing *Moody v. Bos. & Me. Corp.*, 921 F.2d 1 (1st Cir. 1990); *Fletcher v. Union Pac. Ry. Co.*, 621 F.2d 902 (8th Cir. 1980)). There, the estate of a FELA worker who died of congestive heart failure sued the employer, alleging that "[t]he [employer] with knowledge of decedent's high blood pressure and hypertension should have had him examined more frequently with more detailed examinations to determine his physical ability to perform his switchman's job without danger to his life." *Id.* at 124. The district court declined to submit this claim to the jury and granted the employer judgment as a matter of law, reasoning that FELA imposes no duty on an employer to perform periodic physical examinations of its employees. In affirming the district court's decision, the Seventh Circuit succinctly concluded:

> [The decedent's estate] simply alleged that [the employer] should have examined [the decedent] more frequently and in more detail. We have examined the few cases that address the scope of [an employer's] duty to examine its employees and we conclude that the FELA imposes no such duty on [an employer].

*Id.* at 126.

More recently, both the Sixth Circuit and at least one district court in this Circuit have followed *Fulk*'s reasoning and found that a FELA employer has no duty to examine or monitor an employee's health. *See Voytko v. Consol. Rail Corp.*, 94 F.3d 645, 1996 WL 452934, at *3 (6th Cir. 1996) (unpublished table decision) (citing *Fulk* and holding that "[an employer] has no duty to ascertain whether an employee is physically fit for his job"); *McGinnis v. CNO & TP*, 2006 WL 1207718, at *1 (E.D. Ky. May 4, 2006) (relying on *Fulk* to conclude that "the [employer] has no duty to examine an employee to determine whether he is medically capable of performing particular tasks").

Plaintiffs argue that "there is case law that shows a shipowner can be held liable for improper treatment of a seaman by a general practitioner selected by the shipowner, where the shipowner, in view of the seaman's illness, was negligent in failing to select an available specialist to treat the seaman." (Docket No. 50-1, at 11.) Plaintiffs are correct that there is authority to support the proposition that an employer may be liable if it undertakes to give physical examinations and performs those examinations negligently, or if it negligently selects a doctor to provide medical care to its employee. *See Moody*, 921 F.2d at 3; *Fitzgerald v. A.L. Burbank & Co.*, 451 F.2d 670, at 679-80 (2d Cir. 1971). These cases, however, dealt with ways an employer may breach its duty *to provide proper medical treatment*, not whether there exists a duty *to examine or monitor an employee's health*. The claims at issue in Marquette's Motion—those in paragraphs 11(i) and (j) of Plaintiffs' Amended Complaint—do not allege that Marquette failed to provide Champ with proper medical care. Thus, the authorities Plaintiffs rely upon are inapposite here.

Plaintiffs' Response seems to conflate their allegations in paragraphs 11(i) and (j) with a claim that does not in fact appear in their Amended Complaint—namely, that Marquette negligently selected a doctor to examine and treat Champ. Plaintiffs specifically state that after Champ's asthma attack in January 2011: "Marquette's Vice President of Operations for River required [Champ] to be evaluated by his personal physician, Dr. Todd at the Natchez Rural Health Clinic. Dr. Todd is not a specialist." (Docket No. 50-1, at 12 (footnotes omitted).) This, they seem to argue, amounts to negligence on Marquette's part for requiring that Champ be examined by a general practitioner rather than a specialist. Plaintiffs' assertion that Marquette required Champ to be evaluated by his personal physician is without evidentiary support.[5] Moreover, this claim was not pleaded in their Amended Complaint. Regardless, this line of argument not change the fact that Marquette owed Champ no duty to examine or monitor his health under these circumstances.

The foregoing discussion does not, however, dispose of the issue whether a maritime employer owes a duty to its employee to disallow him to work under circumstances that place him at risk of injury or death—or, stated differently, whether a maritime employer has a duty to assign its employee to work for which he is reasonably suited. Marquette's Motion seeks judgment on the pleadings on this claim but does not

---

[5] For their assertion that Marquette "required [Champ] to be evaluated by his personal physician, Dr. Todd," Plaintiffs cite Exhibit B to Marquette's Motion. (*See* Docket No. 50-1, at 12 n.60.) Exhibit B to Marquette's Motion contains Champ's medical records, including records related to his January 2011 examination by Dr. Todd. (Docket No. 43-3.) Nothing in these records, however, supports the assertion that Marquette required Champ to be seen by Dr. Todd. For their almost identical assertion that "Marquette simply requested that Champ be evaluated by Dr. Todd, a family practitioner," Plaintiffs cite Exhibit J, which is attached to their Response. (Docket No. 50-1, at 13 & n.75.) Exhibit J is the transcript from the deposition of their maritime expert, Edward Gras. (Docket No. 50-13.) Plaintiffs do not point to any particular page or line of that 125-page transcript. Regardless, Gras's deposition testimony provides no meaningful evidentiary support for the assertion that Marquette requested that Champ be examined by Dr. Todd.

present any meaningful discussion relative to this issue. In *Fletcher v. Union Pacific R.R. Co.*, a case relied on in Marquette's Motion, the Eighth Circuit held: "A[n employer] has a duty to assign employees to work for which they are reasonably suited. A[n employer] breaches that duty if it negligently assigns an employee to perform work beyond his capacity." 621 F.2d at 909. The Court has found no authority that directly contradicts this proposition. The allegation in paragraph 11(j) of Plaintiffs' Amended Complaint appears to fall within the ambit of the duty recognized in *Fletcher* to assign employees to work for which they are suited and that is within their capacity to perform. Therefore, the Court cannot conclude that Marquette is entitled to judgment on the pleadings as to this issue.

In summation, the Court concludes that Marquette, as a Jones Act employer, had no duty to monitor or evaluate Champ's health under these circumstances. Because there was no duty as a matter of law, Marquette is entitled to judgment on the pleadings relative to the claim in paragraph 11(i) of Plaintiffs' Amended Complaint. However, the Court concludes that Marquette did owe Champ a duty to assign him to work for which he was suited and that was not beyond his capacity to perform. As such, Marquette is not entitled to judgment on the pleadings relative to the claim in paragraph 11(j) of Plaintiffs' Amended Complaint.

3. **Claims that Marquette was negligent by failing to adequately evaluate Champ's medical condition and by allowing Champ to continue working aboard the vessel:** *Breach of duty owed*

Marquette next argues that even if there was a legal duty on the part of a Jones Act employer to evaluate or monitor its employee's medical condition, there is no genuine issue of fact that Marquette breached that duty. Marquette specifically argues

that there is no evidence upon which a jury could find that Marquette acted unreasonably under these circumstances either in evaluating Champ's condition after the January 2011 incident or in allowing him to return to work aboard the RANDY ECKSTEIN. Marquette therefore insists that it is entitled to partial summary judgment on the claims raised in paragraphs 11(i) and (j) of Plaintiffs' Amended Complaint. (*See* Docket No. 43-1, at 24-27.) Having found that Marquette had no duty to monitor or evaluate Champ's medical condition, the Court will limit its discussion here to whether there is a genuine issue of material fact that Marquette breached its duty to assign Champ to work for which he was reasonably suited.

The Court's review of the limited case law on this issue suggests that a Jones Act employer breaches this duty if it knew or should have known that its assignment of an employee to a particular job exposed that employee to an unreasonable risk of harm. *See Fletcher*, 621 F.2d at 909; *Perkins*, 246 F.3d at 599. Thus, the question is whether Plaintiffs have come forward with sufficient evidence to show that Marquette knew or should have known Champ's assignment to work aboard the RANDY ECKSTEIN exposed him to an unreasonable risk of harm and, thus, that Marquette breached a duty to protect Champ from a foreseeable risk. *See*

The Court concludes that Plaintiffs have failed to establish that Marquette breached its duty with respect to the theory that Marquette negligently assigned Champ to work aboard the RANDY ECKSTEIN. In *Perkins v. American Electric Power Fuel Supply, Inc.*, the Sixth Circuit explained:

> It is a fundamental principle that, under the Jones Act, an employer must have notice and the opportunity to correct an unsafe condition before liability will attach. There must be some evidence from which the trier of fact can infer that the owner either knew, or

in the exercise of due care, should have known of the unsafe
condition.

246 F.3d at 509 (internal quotation marks and citation omitted) (citing *Havens v. F/T Polar Mist*, 996 F.2d 215, 218 (9th Cir. 1993)).  Though *Perkins* dealt with a Jones Act negligence claim alleging the employee was provided a defective tool with which to work, its reasoning applies with equal force to a Jones Act claim for negligent assignment.

Although Marquette was aware of Champ's prior asthma-related incidents, the evidence of record fails to show that Marquette knew or should have known that assigning Champ to the RANDY ECKSTEIN would expose him to an unreasonable risk of harm.  The evidence demonstrates that Champ suffered three asthma-related episodes during his employment with Marquette:  the first in April 2006, the second in October 2010, and the third in January 2011.  Each time he was treated and released to return to work with only minimal, if any, work-related restrictions.  Most recently, in January 2011 (more than nine months before his death), Champ was seen and cleared for work with no restrictions by his personal physician, Dr. Todd, who knew Champ was employed as a mate on a river vessel.  No medical provider ever ordered Champ to follow up or submit to regular, ongoing evaluations for his asthma, and there is nothing to suggest that any of these examinations was improperly performed.  Additionally, Champ underwent and passed two preemployment physicals, most recently in July 2010.  The evidence further shows that Champ completed a "Boarding Statement" immediately prior to each trip on board Marquette's vessel.  In 2011, he completed five such statements, the last being on October 11.  In response to the question on each form, "Are you aware of any condition that may impair your ability to perform all duties of

your job classification?" Champ responded, "No."[6]  (*See* Docket No. 43-11, at 1-5.)

Moreover, Plaintiffs' own expert, Dr. Varon, conceded that the likelihood of an asthma

patient having a fatal event is approximately 0.001% or 1 out of 100,000.  (Docket No.

43-2, at 5.)  Thus, there was no information available to Marquette to suggest that

Champ was anything other than medically qualified and reasonably suited to work

aboard the RANDY ECKSTEIN.

Therefore, in the absence of sufficient evidence to show that Marquette knew or

should have known that assigning Champ to the RANDY ECKSTEIN would expose

him to an unreasonable risk of harm, the Court concludes that Plaintiffs have failed to

establish a genuine issue of material fact whether Marquette breached a duty to protect

Champ from a foreseeable risk.   For these reasons, Marquette is entitled to summary

judgment on the claim raised in paragraph 11(j) of Plaintiffs' Amended Complaint.

### 4.    Claim that Marquette was negligent by failing to provide adequate and immediate medical care

Marquette also moves for summary judgment on Plaintiffs' allegations that

Marquette was negligent in "[f]ailing to provide adequate and immediate medical

---

[6] A number of older state court decisions appear to give weight to an employee's awareness of his own physical condition and limitations as they relate to his ability to work or perform a given task.  *See, e.g.*, *Warden-Pullen Coal Co. v. Wallace*, 56 P.2d 802, 804 (Okla. 1936) ("From the very nature of the case, the servant is the best judge of his own physical strength, and the duty is on him, in the absence of an emergency, not to overtax himself. If he is required by the master to go beyond his capacity, the law of self-preservation demands that he quit the master's employment. Certainly if he misconceives his own strength or the requirements of the task undertaken, he cannot hold the master liable for an injury that he might suffer thereby."); *Louisville & Nashville R.R. Co. v. Sawyers*, 184 S.W. 1123, 1124 (Ky. 1916) ("The only safe and practical rule is that each man is the best judge of his own physical strength and powers of endurance; that he knows better than any other can when the limit has been reached, and when, in following his own instinct of self-preservation, he must desist and exercise his right under the law to give up his work if it is more than he can stand."); *Davis v. Louisville & Nashville R.R. Co.*, 173 N.E.2d 749, 755-56 (Ind. Ct. App. 1961) (affirming judgment in favor of FELA employer on employee's claim that he was assigned to work without the employer first ascertaining his physical fitness where the employee was "fully aware of his own physical condition . . . when he returned to work").

attention," which appears in paragraph 11(g) of their Amended Complaint. (Docket No. 43-1, at 27 (referencing Docket No. 27, at 3, ¶ 11(g)).) "The maritime law has long imposed upon shipowners the duty to provide proper medical treatment for seamen falling ill or suffering injury in the service of the ship. This is a duty imposed without fault; it is no mere formal obligation, and a violation of it is actionable under the Jones Act." *Fitzgerald*, 451 F.2d at 679 (citing *De Zon v. Am. President Lines*, 318 U.S. 660, 667-668 (1943); *The Iroquois*, 194 U.S. 240, 241-242 (1904); *Cortes v. Balt. Insular Line*, 287 U.S. 367, 376 (1932)). Thus, a Jones Act employer owes its employees "a duty to exercise reasonable care to furnish such aid as ordinarily prudent persons would under similar circumstances to an injured or ill seaman"; however, the employer "will not be held responsible for an error of judgment on the part of [vessel's] officers, if their judgment is conscientiously exercised with reference to existing conditions." *MacQueen v. CG-50427*, 287 F. Supp. 778, 782 (E.D. Mich. 1968) (citing, *e.g.*, *The Van Der Duyn*, 261 F. 887 (2d Cir. 1919)). The measure of this duty therefore depends upon the particular circumstances of the case, including the seriousness of the illness and the availability of aid.

In *De Zon v. American President Lines, Ltd.*, the Supreme Court explained:

> Although there may be no duty to the seaman to carry a physician, the circumstances may be such as to require reasonable measures to get him to one, as by turning back, putting in to the nearest port although not one of call, hailing a passing ship, or taking other measures of considerable cost in time and money. Failure to furnish such care, even at the cost of a week's delay, has been held by this Court to be a basis for damages.

318 U.S. at 668 (citing *The Iroquois*, 194 U.S. at 241-42). This standard has since been followed by a number of circuit and district courts, including at least one court in this

Circuit. *E.g.*, *Cent. Gulf S.S. Corp. v. Sambula*, 405 F.2d 291, 300 (5th Cir. 1968 ) (noting that the duty to provide medical care "varies with the circumstances of each case" and that it may, depending on those circumstances, become "necessary to turn the ship around or make an arduous detour in order to have competent medical treatment and advice"); *MacQueen*, 287 F. Supp. at 781 ("It is the duty of a vessel to care for a seaman who is taken ill or receives an injury on a voyage in the service of the ship of the extent of providing medical care and attendance . . . at the expense of the ship. It is further required, where circumstances warrant it, that the Master shall exercise a reasonable judgment as to putting into the nearest available port, in order that proper treatment may be secured."); *accord Unica v. United States*, 287 F. 177, 179 (S.D. Ala. 1923) ("Where a seaman is seriously injured, and there is no surgeon on the boat, it is the duty of the master to have him taken speedily to a hospital, where he can be treated.").

Although Marquette presents a compelling argument why this duty was not breached, that argument is more appropriately reserved for trial. Plaintiffs have come forward with evidence tending to show some delay in calling for emergency responders and in securing emergency medical treatment for Champ. Plaintiffs also have presented evidence, by way of their maritime expert, to show that this duty was breached by failing to put in at an earlier port upriver or otherwise taking appropriate and available measures to get Champ off the RANDY ECKSTEIN and to a physician. Furthermore, Plaintiffs have presented evidence through their medical expert, Dr. Varon, in which Dr. Varon opines that Champ likely would have survived had emergency medical personnel been called and Champ been transported to a medical facility as little as 15 or 20

minutes earlier.  Because the Court finds this evidence sufficient to establish a genuine issue of material fact whether Marquette was negligent in failing to provide adequate and immediate medical attention, summary judgment is not warranted in regard to this claim.

**E.      Motion for Partial Summary Judgment as to the Allegations in Paragraph 11(j) of Plaintiffs' Amended Complaint**

For their final Motion, Marquette moves for summary judgment as to Plaintiffs' allegations that Marquette was negligent in allowing Champ to continue working in light of his medical condition.   (Docket No. 47.)   In their Amended Complaint, Plaintiffs specifically allege that Marquette was negligent for "[a]llowing [Champ] to continue working aboard [Marquette]'s vessel when [Champ]'s medical condition placed him at risk of serious injury or death." (Docket No. 27, at 3.)  Marquette argues that this claim fails as a matter of law because had Champ's employment been terminated on account of his medical condition, Marquette necessarily would have violated Title I of the Americans with Disabilities Act (ADA).  (Docket No. 47-1.)  The Court has found no case or other authority addressing whether a Jones Act negligence claim is defeated where the employer is essentially faced with a choice between either acting negligently or violating the ADA.  And though Marquette presents an interesting argument, the Court is not convinced that Marquette would have been faced with such a lose-lose choice, as it suggests.  Nor is the Court convinced that a Jones Act negligence claim is necessarily defeated simply because the alternative to the negligent conduct alleged could hypothetically expose an employer to liability under the ADA. Regardless, the Court need not delve fully into the uncertainty that attends these issues,

given that the Court's conclusion *supra* Part II.D.3 disposes of the claims in paragraph 11(j) of Plaintiffs' Amended Complaint. As such, this Motion will be denied as moot.

CONCLUSION

Therefore, having considered Marquette's several Motions and the parties' respective arguments in relation thereto, consistent with the foregoing discussion;

IT IS HEREBY ORDERED as follows:

(1) Marquette's Motion in Limine to Exclude Certain Opinions of Plaintiffs' Expert, Dr. Joseph Varon, (Docket No. 49), is GRANTED IN PART and DENIED IN PART;

(2) Marquette's Motion in Limine to Exclude Plaintiffs' Expert, Edward Gras, (Docket No. 48), is GRANTED IN PART and DENIED IN PART;

(3) Marquette's Motion for Judgment on the Pleadings of Certain Claims, (Docket No. 39), is GRANTED, and the direct claims filed by Sias and L.S; the claims filed by Mrs. Champ, individually, as well as any claims she purports to file on behalf of Champ's estate; and the Plaintiffs' claims for loss of society and companionship, loss of future wages and earning capacity, and loss of fringe benefits are hereby DISMISSED;

(4) Marquette's Motion in Limine to Exclude Evidence of Mrs. Champ's Alleged Damages, (Docket No. 40), is GRANTED;

(5) Marquette's Motion for Partial Summary Judgment as to Certain Categories of Damages, (Docket No. 42), is GRANTED IN PART and DENIED IN PART as follows:

(a) Marquette's Motion is GRANTED as to Plaintiffs' claims for loss of services; loss of enjoyment of life; loss of society and companionship; emotional distress and mental anguish, not including Champ's predeath pain and suffering; and all other nonspecified damages, other than loss of prospective inheritance, and these claims are hereby DISMISSED;

(b) Marquette's Motion is DENIED as to Plaintiffs' claim for loss of nurture, guidance, care, and instruction; however,

any recovery on this claim by either Sias or L.S. is contingent on their proving unseaworthiness and is limited to the period between Champ's death and the time each reached or reaches the age of majority;

(c) Marquette's Motion is DENIED as to Sias's claim for loss of support;

(d) Marquette's Motion is DENIED as to L.S.'s claim for loss of support; however, any recovery on this claim by L.S. shall be limited to the amount of court-ordered child support;

(6) Marquette's Motion for Judgment on the Pleadings or, Alternatively, for Partial Summary Judgment Relative to Particular Negligence Claims, (Docket No. 43), is GRANTED IN PART and DENIED IN PART as follows:

(a) Marquette's Motion for Judgment on the Pleadings as to Plaintiffs' claim that Marquette failed to adequately evaluate or monitor Champ's medical condition, (Am. Compl. ¶ 11(i)), is GRANTED;

(b) Marquette's Motion for Partial Summary Judgment as to Plaintiffs' claim that Marquette negligently allowed Champ to continue working aboard the vessel, (Am. Compl. ¶ 11(j)), is GRANTED;

(c) Marquette's Motion for Partial Summary Judgment as to Plaintiffs' claim that Marquette failed to provide adequate and immediate medical care, (Am. Compl. ¶ 11(g)), is DENIED; and

(7) Marquette's Motion for Partial Summary Judgment as to Paragraph 11(j) of Plaintiffs' Amended Complaint, (Docket No. 47), is DENIED as moot.

IT IS SO ORDERED.

Date:

cc:      Counsel